IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CALVIN LAMONT HOLMAN, #193826, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 2:14-cv-115-WHA |
| | ) | (WO) |
| WARDEN KENNETH L. JONES; | ) | |
| WARDEN SANDRA GILES; WARDEN | ) | |
| RENE MASON; CAPT. SYLVESTER | ) | |
| NETTLES; SERGEANT JEREMY | ) | |
| MCKINNEY; COL. B. MIMS; COL. A. | ) | |
| LAMBERT; SERGEANT ELIZABETH | ) | |
| LASETER; COL. MICHAEL HOLCEY; | ) | |
| COL. A.T. HARRIS; and DOCTOR TAHIR | ) | |
| SIDDIQ, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

Plaintiff Calvin Lamont Holman brings this action pursuant to 42 U.S.C. § 1983,

challenging the conditions of his confinement and the medical treatment he received

while he was an inmate of Bullock Correctional Facility ("Bullock") in Union Springs,

Alabama, from about February 21, 2012, through about July 18, 2012. Doc. No. 1 at

11-25. The claims arise out of Holman's fall from a bunk bed and his subsequent medical

treatment.  Holman seeks declaratory and injunctive relief as well as money damages.

Doc. No. 1 at 27-28.

The defendants originally named to this action included Kenneth L. Jones; Sandra Giles; Rene Mason; Sylvester Nettles; Jeremy McKinney; B. Mims; A. Lambert; Elizabeth Laseter; Michael Holcey; A.T. Harris; and Dr. Tahir Siddiq. Doc. No. 1 at 1-3. Holman moved to dismiss defendants Giles, Mason, and Nettles. Doc. No. 46 at 1. The court recommends that defendants Giles, Mason, and Nettles be dismissed. This recommendation addresses only the remaining defendants, Jones, McKinney, Mims, Lambert, Laseter, Holcey, Harris, and Siddiq.

Pursuant to the orders of this court, defendants filed answers, special reports, a supplemental report, and supporting evidentiary materials addressing the claims for relief raised in the complaint. In their reports, defendants deny they violated Holman's Eighth Amendment rights, and they assert he is not entitled to relief. Additionally, defendants assert that the complaint is due to be dismissed because Holman failed to properly exhaust his administrative remedy available to him at Bullock with respect to the claims presented in this cause of action. Doc. Nos. 28, 29, 33, 34, 35, 40, 41, 75, 78, 79, 80, 81, 82, 85, 86, 87, 89.

"[A]n exhaustion defense . . . is not ordinarily the proper subject for a summary judgment; instead it 'should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment.'" *Bryant v. Rich*, 530 F.3d 1368, 1374-75 (11th Cir. 2008). Therefore, the court will treat the defendants' report that Holman did not exhaust his administrative remedies as a motion to dismiss. Upon consideration of this motion and the evidentiary materials filed in support thereof, the court concludes that

the motion to dismiss with respect to the exhaustion defense is due to be granted.  The court also construes the defendants' report as a motion for summary judgment, and upon consideration of the motion and the evidentiary materials filed in support thereof, the court concludes that the defendants' motion for summary judgment is due to be granted on the merits of Holman's claims remaining after the unexhausted claims.

## II. EXHAUSTION

### A. Applicable Law

The Prison Litigation Reform Act ("PLRA") compels exhaustion of available administrative remedies before a prisoner can seek relief in federal court on a § 1983 complaint. Specifically, 42 U.S.C. § 1997e(a) states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life," *Porter v. Nussle,* 534 U.S. 516, 532 (2002), "irrespective of the forms of relief sought and offered through administrative remedies," *Booth v. Churner,* 532 U.S. 731, 741 n.6 (2001).  Moreover, "the  PLRA exhaustion requirement requires *proper exhaustion.*"  *Woodford v. Ngo,* 548 U.S. 81, 93 (2006) (emphasis added).

> Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules [as a precondition to filing suit in federal court] because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings. . . . Construing § 1997e(a) to require proper exhaustion . . . fits with the general

3

> scheme of the PLRA, whereas [a contrary] interpretation [allowing an inmate to bring suit in federal court once administrative remedies are no longer available] would turn that provision into a largely useless appendage.

*Id.* at 90-91, 93 (footnote omitted); *Johnson v. Meadows,* 418 F.3d 1152, 1157 (11th Cir. 2005) (inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion requirement of the PLRA). "The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016). "The only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint." *Smith v. Terry,* 491 F. App'x 81, 83 (11th Cir. 2012) (per curiam).

Exhaustion under the PLRA is a "threshold matter" that must be addressed before considering the merits of the case and cannot be waived. *Chandler v. Crosby*, 379 F.3d 1278, 1286 (11th Cir. 2004); *Alexander v. Hawk*, 159 F.3d 1321, 1325-26 (11th Cir. 1998) (exhaustion not waivable). "When deciding whether a prisoner has exhausted his remedies, the court should first consider the plaintiff's and the defendants' versions of the facts, and if they conflict, take the plaintiff's version of the facts as true. 'If in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed.'" *Myles v. Miami-Dade County Corr. & Rehab. Dep't*, 476 F. App'x 364, 366 (11th Cir. 2012) (quoting *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008) (citing *Bryant*, 530 F.3d at 1373-74)). "If the complaint

is not subject to dismissal at this step, then the court should make 'specific findings in order to resolve the disputed factual issues related to exhaustion.'" *Myles*, 476 F. App'x at 366 (quoting *Turner* 541 F.3d at 1082 (citing *Bryant*, 530 F.3d at 1373-74, 1376)); *see also Bryant*, 530 F.3d at 1376 (exhaustion factual dispute is for the judge, not jury).

## B. Discussion

The prison officials adopt defendant Siddiq's affirmative defense that Holman failed to exhaust his administrative remedies regarding his medical claims before filing suit, however defendant Siddiq is the primary proponent of the failure to exhaust argument. Doc. No. 28, 29, 33, 34, 35, 40, 41. Upon review of the undisputed facts of this case as evidenced by the materials filed by the defendants, the materials filed by Holman, and the parties' sworn statements, the court concludes that Holman failed to exhaust his available administrative remedies before filing suit on his medical treatment claim, therefore the defendants' motion to dismiss for lack of exhaustion on this issue is due to be granted.

### 1. Summary of Material Facts Regarding Medical Grievance Process

The record in this case is undisputed that the health care provider for the ADOC provides a grievance procedure for inmate complaints related to the provision of medical treatment. Doc. No. 28-1, at ¶¶ 4-5 ("Siddiq Aff. Doc. No. 28-1"). This procedure, as it relates to the Holman's claims, is described as follows: When inmates go through the initial orientation process in the ADOC, they are educated about the availability of the medical grievance process whereby they may voice complaints regarding any medical

treatment sought or received during their incarceration. *Id.* ¶¶ 4, 11. When he arrived at Bullock, Holman acknowledged he understood how to access health care at the institution. Doc. No. 28-2, at 3 (COR0002). The grievance process is initiated when an inmate submits a medical grievance form to the attention of the Health Services Administrator ("HSA") through the institutional mail system. Siddiq Aff. Doc. No. 28-1, ¶ 11. Medical staff review the grievance and return the form to the inmate with a written response at the bottom of the grievance form within five days of receipt of the medical grievance. *Id.* ¶¶ 11-12. The grievance form contains a notation informing inmates that if they wish to appeal the initial response, they may request a grievance appeal form from the HSA. *Id.* ¶ 12. The notation further directs inmates to return the completed grievance appeal form to the attention of the HSA by placing the form in one of the sick call request boxes located throughout the facility. *Id.* The second step of the grievance process is an appeal. Prisoners can get medical grievance appeal forms from officers and return them "in the sick call request box or give it to the segregation sick call nurse on rounds." *Id.* The HSA responds to inmate grievance appeals within five days. *Id.* Holman states the HSA was fired and no longer works at Bullock, but Holman does not state when the HSA left. Doc. No. 47, at 5, ¶ 20.

Holman's prison medical records reflect he submitted a medical grievance dated April 18, 2012, before he filed this lawsuit. In it he complained that he fell from his top bunk on February 21, 2012, and sustained ruptured disks; he saw Dr. Holt on April 4, 2012, and they agreed Holman should have surgery to repair them; but as of two weeks

later Holman heard no word about surgery; and he was suffering pain.  Doc. No. 28-3, at 125 (COR0246). Holman received a response to the grievance stating he was scheduled to go off site soon.  *Id.*  Siddiq avers that for security reasons inmates cannot be told exactly when they are scheduled for an off site appointment, but Holman underwent surgery within two weeks of the grievance response.  Siddiq Aff. Doc. No. 28-1, at ¶ 12. Siddiq states that Holman filed no medical grievance appeal regarding the response provided to his grievance.  *Id.*

Plaintiff had an opportunity to respond to defendants' arguments. Doc. No. 42. In response, Holman submitted only a medical grievance he filled out dated June 7, 2013, in which he complained that he was in pain because Siddiq refused to comply with Dr. Holt's medical orders.  Doc. No. 46, at 14.  The grievance does not include a response from a prison official.  Holman submitted a second medical grievance, dated many months after Holman filed this lawsuit, in which he mentioned a grievance filed "in June or July" complaining that Dr. Siddiq was refusing to comply with Dr. Holt's orders.  *Id.* at 13.  Holman also submitted a letter dated September 13, 2011, to Jones describing Holman's diabetes and asking for a bottom bunk profile at Bullock.  *Id.* at 12.  Holman avers that he tried to exhaust his administrative remedies by filing medical grievances as well as sending letters to the Warden, but they "were not always responded to."  Doc. No. 46, at 10, ¶ 42 ("Holman Aff. Doc. No. 46").  In a separate filing, Holman states that he attached for the court his letters to Warden Jones, but the attachments to which Holman refers are not attached to Holman's filing.  Doc. No. 47, at 3-4, ¶¶ 14, 22.  Holman avers

that the slots where medical grievances are placed "are small and inadequate in which to submit said forms," that the forms are available only from the infirmary, that "sick call has a fee one must pay," and "the boxes in front of the infirmary are the only place such can be submitted." *Id.* at 5, ¶ 18.

## 2. Discussion of Exhaustion of Administrative Remedies

Holman's completion of the grievance process regarding his medical claim is a precondition to proceeding on the claim. *See* 42 U.S.C. § 1997e(a). It is undisputed that although the medical grievance process provides for appeals, Holman filed no medical grievance appeal before filing suit in this case. Holman asserts the boxes to submit medical grievances are inadequate and the infirmary is the only place they can be submitted, but he does not assert that he could not file an appeal to a nurse, or that filing a grievance appeal was impossible or otherwise "unavailable." Holman does not assert the administrative procedure was unavailable because, for example, it "operates as a simple dead end," or that it is "so opaque that it becomes, practically speaking, incapable of use," or that prison administrators prevented him from using the process. *See Ross*, 136 S. Ct. at 1859-60 (discussing circumstances in which an administrative procedure might not be "available" under § 1997e(a)). Consequently, Holman does not dispute that he failed to exhaust his available administrative remedy before filing this lawsuit against Siddiq regarding his allegation of inadequate medical care. Rather, all of the evidence before the court demonstrates that Holman failed to complete the available medical grievance process before filing suit. The Court concludes that Holman's medical claims

against Siddiq are subject to dismissal, *see Woodford*, 548 U.S. at 87-94, and that the dismissal is without prejudice.

## III. SUMMARY JUDGMENT

Because Holman's medical care claims are due to be dismissed without prejudice for failure to exhaust, the court's summary judgment discussion will address only Holman's Eighth Amendment claims unrelated to his medical care. Those claims center on events that occurred on about February 21, 28, and 29, 2012.

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former Fed. R. Civ. P. 56 omitted; "issue" altered to "dispute" to reflect the stylistic change in the current rule). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (alterations added). The movant may

9

meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

The defendants in this case have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to the case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324. Pursuant to Rule 56, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact" by citing to materials in the record including affidavits, relevant documents or other materials, the court can, among other things, "consider the fact undisputed for purposes of the motion . . . [or] grant summary judgment if the motion and supporting materials— including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted). The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); Fed. R. Civ. P. 56(e). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice . . . ." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam) (plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment"). Only disputes involving material facts are relevant, and what is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248. To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Although factual inferences must be viewed in a light most favorable to the nonmoving party and pro se complaints

are entitled to liberal interpretation by the courts, a pro se litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's pro se status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Holman fails to demonstrate a requisite genuine dispute of material so as to preclude summary judgment on all of his claims against the defendants. *Matsushita*, 475 U.S. at 587.

### B. Summary of Material Facts Regarding Eighth Amendment Claims[1]

The court views the facts in the light most favorable to Holman, the nonmoving party. The facts are undisputed except as noted. During the time relevant to the complaint, all the parties were located at Bullock Correctional Facility. Holman was an inmate; Jones was the Warden; McKinney and Laseter were Correctional Sergeants; Mims, Lambert, Holsey, and Harris were Correctional Officers; and Siddiq was the Medical Director. Doc. Nos. 28, 35, 41.

### 1. February 21, 2012

On February 21, 2012, Holman was moved from the general population at Bullock to a two-person isolation cell in disciplinary segregation. Doc. No. 1, at 11. McKinney avers that he ordered Holman to be moved to segregation at 5:18 a.m. on February 21, 2012. Doc. No. 41-1, ¶ 1 ("McKinney Aff. Doc. No. 41-1"). An incident report prepared on February 21, 2012, indicates that McKinney ordered another officer to handcuff

---

[1] Admittedly, the recitation of the facts in this case is similar to a "stream of consciousness" exhortation. But, this manner of presentation provides context useful to understand the environment in which the parties existed at the time of the events relevant to this case.

Holman and take him to the Health Care Unit, where a nurse completed a body chart on Holman at about 5:40 a.m.  Doc. No. 41-1, at 4.  Eight minutes later, the officer escorted Holman to the segregation unit, and he was placed in cell B1-13B. *Id.*; Doc. No 41-1, at 8.  Top bunks are designated with a "B" suffix.  McKinney Aff. Doc. No. 41-1, ¶ 4. Before he moved to segregation, Holman was assigned to cell "I1-2B," which also had a "B" suffix, indicating it was a top bunk bed.  Doc. No. 41-1, at 8.  According to McKinney, the segregation cells at Bullock are designed to house two inmates, and they are not overcrowded or unsafe. McKinney Aff. Doc. No. 41-1, ¶ 3.  Holman, however, asserts in his verified complaint that the prison is overcrowded.  Doc. No. 1, at 11. Holman submitted an affidavit from Rodrigas Smith, another inmate in the segregation unit, who states that sometime between 6:00 a.m. and 6:00 p.m. on February 21, 2012, in the segregation unit, he heard Holman tell Mims that he had a bottom bunk profile, but Mims said "he did not have time to f*ck with that shi*t because he had to get out of here and go home," that Mims said the B bed was the only available bed, and that Holman would have to work it out with his cell mate. Doc. No. 47, at 10, ¶¶ 3-5 (Smith Aff. Doc. No. 47).  The incident report about Holman's move to segregation does not mention Mims, and instead it names other officers who contacted McKinney and escorted Holman.  Doc. No. 41-1, at 4-8.

On February 21, 2012, Holman had an order from a doctor for a bottom bunk bed assignment. Doc. No. 1-1. Holman states that Jones, McKinney, and Mims knew of the bottom bed profile because of Holman's diabetic medical condition, but they dispute it.

13

Doc. No. 1, at 12; Doc. Nos. 35-1, 35-4, 41-1.  Siddiq avers that when inmates at Bullock receive a bottom bunk profile from him, "they are required to maintain a copy of the profile with them and the Bullock security staff allows inmates to maintain profiles in their personal storage areas." Doc. No. 33-1, at ¶ 9 ("Siddiq Aff. Doc. No. 33-1"). According to Siddiq, the staff does not keep a log of inmates with bottom bunk profiles; instead, if an inmate is transferred, the inmate must inform security staff of the bottom bunk profile and provide a copy of the profile to the officer. *Id.*  If the inmate loses his profile, the inmate must submit a sick call request to get a replacement.  *Id.*

Holman first received a "bottom bunk profile" on December 2, 2011.  Siddiq Aff. Doc. No. 33-1, ¶ 9; Doc. No. 33-2, at 3 (COR0248).  On December 15, 2011, Holman submitted a sick call slip requesting another copy of the profile because an officer took it and said it was illegible.  Siddiq Aff. Doc. No. 33-1, ¶ 10; Doc. No. 33-2, at 8 (COR0253).  The next day, Holman attended sick call and received a bottom bunk profile from that date through March 16, 2011.  Siddiq Aff. Doc. No. 33-1, ¶ 10; Doc. No. 33-2, at 8 (COR0253).  Holman submitted a sick call on February 14, 2012, asking for renewal of the profile.  Siddiq Aff. Doc. No. 33-1, ¶ 10; Doc. No. 33-2, at 15 (COR0260).  On February 15, 2012, Holman received a bottom bunk profile lasting from February 15, 2012, through May 15, 2012. Siddiq Aff. Doc. No. 33-1, ¶ 10; Doc. No. 33-2, at 17 (COR0262).  Holman asserts in his verified complaint that he received the bottom bed assignment because he is a diabetic prone to developing high blood sugar and suffering a diabetic seizure or coma.  Doc. No. 1, at 12.  On March 1, 2012, Holman reported to a

14

mental health staff member that he fell off the top bunk, that in ten years of incarceration that had never happened, and he admitted that he "did not inform seg officer of profile." Doc. No. 33-2, at 58-59 (COR0303-304).   Nevertheless, Holman asserts that  Jones, McKinney, and Mims were security supervisors, they toured Bullock daily and knew Holman had a bottom bunk because his profile was included in his permanent institutional profile, and they had authority to remove Holman from the dangerous top bunk.  Doc. No 1, at 13. He further swears that McKinney knows him because McKinney also checks inmate identification at the kitchen door, and McKinney knew Holman is a diabetic with a bottom bunk and modified diet.  Holman Aff. Doc. No. 47, at 14-15, ¶¶ 11-12.  Holman swears he notified McKinney, Mims, and Lambert of his bottom bunk profile upon being assigned to a segregation cell.  *Id.* at 15, ¶¶ 14-15.

Siddiq avers that on February 21, 2012, no one asked Siddiq to confirm Holman's bottom bunk profile, or notified Siddiq that Holman had not given officers his bottom bunk profile, or notified Siddiq that Holman was assigned to a top bunk until medical staff members were called to Holman's cell because of his fall.  Siddiq Aff. Doc. No. 33-1, ¶ 12.  Siddiq found out about Holman's top bunk assignment at 10:33 p.m. when he was called by telephone to authorize Holman's transfer to the hospital.  *Id.*

McKinney avers that he had no personal knowledge that Holman was susceptible to diabetic seizures or diabetic coma, or that Holman had a bottom bunk profile or a medical condition requiring a bottom bunk.  McKinney Aff. Doc. No. 41-1, at 2-3, ¶ 4. Contrary to Holman's statement, McKinney avers that Holman never showed him a

bottom bunk profile or told McKinney he had one. *Id.* McKinney avers that if he had known Holman had a bottom bunk profile, he would have accommodated the profile by assigning Holman to a bottom bed. *Id.* McKinney avers that he did not order Mims to assign Holman to a top bunk in violation of the bottom bunk profile. *Id.*

Mims avers that he did not know of Holman's medical issues or his bottom bunk profile. Doc. No. 35-4, at 2 ("Mims Aff. Doc. No. 35-4"). Mims states he did not see Holman fall from the bunk, and he had no knowledge that Holman fell or had a seizure. *Id.* at 2. Mims states he drove a security vehicle that followed Holman to the hospital on the night of February 21, 2012, and he drove Holman back to Bullock early on February 22, 2012. *Id.* at 2.

In his verified complaint, Holman stated that at about 8:30 p.m. on February 21, 2012, he complained of a "real, bad headache" and "dizzy spell" to defendant Lambert. Doc. No. 1, at 16. Holman states that Lambert said he would get Holman to the infirmary to get checked out, but Holman did not see Lambert again until 10:00 p.m. *Id.* During the "diabetic snack-call" on February 21, 2012, Holman again told Lambert that he still had a bad headache and dizzy spell, and that Holman wanted to go to the infirmary. *Id.* at 16-17. According to Holman, Lambert responded, "Eat your diabetic snack, and get the f*ck away from the door . . . [b]ecause I'm not going to call anyone." *Id.* at 17. Inmate Smith also submitted a sworn statement that he overheard Lambert make the statement. Smith Aff. Doc. No. 47, at 11, ¶ 7.

In response, Lambert avers that Holman never reported medical issues to Lambert or asked to see someone from medical.  Doc. No. 35-5, ¶ 1 ("Lambert Aff.").  Lambert states that inmates who need medical help fill out sick call request forms.  *Id.* ¶ 2. Lambert states that if an inmate needs emergency medical treatment while in segregation, security will notify a supervisor to get medical to the unit, which is what Lambert did later on February 21, 2012.  *Id.* ¶ 3. Lambert did not see Holman fall, but he responded to a call from Holman's cell partner that Holman fell.  *Id.*  When Lambert arrived, Holman appeared to be having a seizure.  Lambert informed his supervisors, defendants Laseter and McKinney, who arrived and called the officer in the Health Care Unit to send medical help.  *Id.*  Lambert states that four nurses arrived, assessed Holman, and put a neck brace on him.  *Id.*  Lambert states Holman was then taken to the Health Care Unit on a stretcher.  *Id.*

Holman asserts that as he lay unconscious following the fall from his top bunk, defendant Laseter ordered the segregation officer to open several segregation cells to allow other inmates to give emergency medical attention to Holman when he was unconscious.  Doc. No. 1, at 18.  Holman further maintains that Laseter did not call the medical response team but instead allowed other inmates to lift Holman's body off the floor, put him on a gurney, and carry him to the infirmary.  *Id.*  Inmate Smith, who was not in Holman's cell but overheard the incident, swears that he heard officers Laseter, McKinney, Mims, Lambert, and Freeman, who is not a defendant, respond.  Smith Aff. Doc. No. 47, at 11, ¶ 9.  According to Smith, Laseter ordered an officer to open the cell

door so a gurney could be brought from the infirmary, Laseter asked if any inmate in the segregation unit would pick up Holman to put him on the gurney, and Smith volunteered to help. *Id.* ¶¶ 10-11. Smith states he helped carry the gurney to the infirmary along with Laseter, McKinney, Mims, and Freeman, and then Smith was escorted back to segregation. *Id.* at 12, ¶ 12.

Laseter avers that she never instructed an officer to open the segregation unit cell doors so that inmates could assist in providing emergency medical attention to Holman. Doc. No. 35-6, at ¶ 1 ("Laseter Aff."). Laseter states that Holman was unconscious throughout the events that occurred in his cell. *Id.* ¶ 2. Laseter arrived to Holman's cell to see him on the floor. Laseter called an officer in the Health Care Unit and ordered nurses to report to the Segregation Unit because an inmate was down on the floor. *Id.* ¶ 3. Laseter avers the Health Care Unit is located next to the Segregation Unit, and the nurses arrived in less than two minutes. *Id.* ¶ 4. Laseter admits that inmates helped move Holman onto a stretcher. *Id.* ¶ 4. Laseter states that defendant Lambert and officer Freeman, who is not a defendant, escorted Holman, who was on a stretcher in a neck brace, to the Health Care Unit. *Id.* Laseter states that medical nurses assessed Holman's medical condition in the cell, placed a neck brace on him, and instructed Holman to be moved to the Health Care Unit. *Id.* ¶ 5.

Jones avers that he has no personal knowledge of Holman receiving a bottom bunk profile, and Holman did not inform Jones of it. Doc. No. 35-1, at 1 ("Jones Aff."). Jones states the Segregation Unit at Bullock is not overcrowded; inmates in medium custody

are assigned to two-man cells; and the top bunks are about five feet from the floor, not nine feet. *Id.* Jones avers that he has no knowledge of Holman being forced to sleep on a top bunk in noncompliance with a medical order. *Id.* at 2. Jones states he has no personal knowledge of the acts Holman alleges other defendants did, Holman never lodged a complaint to Jones about any of the allegations, and Jones denies violating Holman's constitutional rights. *Id.*

### 2. February 28 and 29, 2012

Medical staff at the hospital could not determine any major abnormalities in Holman's back, and he was discharged from the hospital with a diagnosis of backache and malingering. Doc. No. 33-2, at 27, 33 (COR0272, COR0278). Holman remained in the infirmary until February 28, 2012. Siddiq Aff. Doc. No. 33-1, at 4, ¶ 7; Doc. No. 33-2, at 54 (COR0299). While he was in the infirmary, Siddiq ordered that Holman have a wheel chair to sit in until March 25, 2012; and on February 28, 2012, Holman received permission to use the wheel chair to go from his cell to the shower from February 28 to March 30, 2012. Doc. No. 33-2, at 42, 55 (COR0287, COR0300). At the time of his return to segregation, medical staff could not determine a cause for Holman's back pain, and Siddiq ordered follow up imaging studies on February 29, 2012, which again showed no signs of injury or trauma to Holman's back. Siddiq Aff. Doc. No. 33-1, at 4-5, ¶ 8.

In his verified complaint, Holman states that upon his return to segregation on February 28, 2012, he was forced to sleep on a concrete slab; that on February 28, 2012, Holcey informed Holman that Jones "ordered the removal of plaintiff's mattress while in

segregation—even under plaintiff's pre-existing conditions"; and that on February 29, 2012, Harris disregarded Holman's medical conditions and forced Holman to sleep on a concrete slab.  Doc. No. 1, at 20-21.  On March 1, 2012, Siddiq wrote Holman an order allowing Holman to have a mattress during the day time until March 31, 2012.  Doc. No. 33-2, at 60 (COR0305).  Holman states there is no penological reason to remove mattresses except to inflict punishment on inmates.  Doc. No. 46, at 7, ¶ 28.

The prison policy requires that mattresses in segregation be removed from 7 a.m. to 4 p.m. Monday through Friday, but inmates are allowed to sleep on their mattresses the other sixteen hours on those days and on weekends.  Doc. No. 35-8, ¶ 1 ("Harris Aff.").  Harris avers he has no knowledge of Holman having ruptured disks.  He knows Holman was in the Health Care Unit for six days before being medically cleared to return to the Segregation Unit.  *Id.* ¶ 2.  Holcey avers that mattresses in disciplinary segregation are removed for eight hours during the day, and there was no medical directive not to remove Holman's mattress.  Doc. No. 35-7, ¶ 1 ("Holcey Aff.").  Holcey states he has no knowledge of Holman's medical conditions or treatment, and there were no medical orders to treat Holman differently for pill call while he was in the Segregation Unit.  *Id.* ¶ 2.  Holcey states inmates in segregation are not allowed to remain in bed and sleep for twenty-four hours a day.  *Id.*  Jones states he has no personal knowledge of the acts Holman alleges other defendants did, Holman never lodged a complaint to Jones about any of the allegations, and Jones denies violating Holman's constitutional rights.  Jones Aff. Doc. No. 35-1, at 2.

### C. Defendants' Absolute Immunity in Their Official Capacities

To the extent Holman sues the defendants in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). State officials may not be sued in their official capacity unless the state has waived its Eleventh Amendment immunity or unless Congress has abrogated the state's immunity, and neither has occurred in this case. *See Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996) (discussing abrogation by Congress); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984) (discussing Eleventh Amendment immunity); *Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir.1990) (Alabama has not waived Eleventh Amendment immunity)). In light of the foregoing, defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities.

### D. Defendants Jones, McKinney, and Mims in Their Supervisory Capacities

Holman names Jones, McKinney, and Mims as defendants, asserting that, as supervisors of security, they toured Bullock daily, knew Holman had a bottom bunk because his profile was included in his permanent institutional profile, and they had authority to remove Holman from the dangerous top bunk.  Doc. No 1, at 13. Holman further asserts that Jones ordered the removal of Holman's mattress while in segregation despite Holman's preexisting medical conditions.  Doc. No.1, at 20.

Jones, McKinney, and Mims cannot be held liable solely on the basis of respondeat superior. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (citations omitted). Liability against a supervisor may be imposed only if a plaintiff shows the supervisor either personally participated in the alleged constitutional violation or instigated or adopted a policy that violated the plaintiff's constitutional rights. *Id.* at 1360 ("supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation"); *see also Salas v. Tillman*, 162 F. App'x 918, 922 (11th Cir. 2006) ("an official also may be liable where a policy or custom that he established or utilized resulted in deliberate indifference to an inmate's constitutional rights").

Here, it is undisputed that Jones was not personally involved in the events giving rise to Holman's complaint. Contrary to Holman's assertion, placement of information in an inmate's institutional file does not mean the Warden personally knew about it. Holman has presented no evidence sufficient to create a genuine issue of disputed fact with respect to the claim that Jones knew about Holman's bottom bunk status, that he forced Holman to sleep on the top bunk anyway, or that he forced Holman to sleep on the concrete floor despite his medical conditions. Accordingly, Jones is entitled to judgment as a matter of law. Similarly, apart from their roles discussed *infra*, nothing in the record suggests McKinney or Mims were otherwise personally involved in the events

22

concerning Holman's complaint, therefore McKinney and Mims cannot be held liable based on their supervisory positions. *See Cottone*, 326 F.3d at 1360.

### E. Eighth Amendment

Holman argues that defendants subjected him to inhumane conditions in violation of the Eighth Amendment, and they were deliberately indifferent to a substantial risk of serious harm to him and his medical needs. The Eighth Amendment protects prisoners from the "unnecessary and wanton infliction of pain" that is "totally without penological justification." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981), quotation marks omitted). Conditions that "deprive inmates of the minimal civilized measure of life's necessities" can be cruel and unusual under the contemporary standard of decency, "[b]ut conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Rhodes*, 452 U.S. at 347.

The Eighth Amendment protection extends to inmate safety, and in the context of a prison official's failure to protect an inmate from harm, an inmate demonstrates an Eighth Amendment violation when the inmate shows that "a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016) (citation and quotation marks omitted); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (deprivation must be sufficiently serious, and prison official must be deliberately indifferent to the inmate's health or safety).

An Eighth Amendment claim includes an objective component and a subjective component. *Bowen*, 826 F.3d at 1320. The inmate must face an objectively substantial risk of serious harm, and the official must be aware of this substantial risk and react to the risk in an objectively unreasonable manner. *Id.* A medical need is serious if it "'has been diagnosed by a physician as mandating treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (citation and quotation marks omitted). On the subjective component, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference . . . The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 837-38; *see also Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("proof that the defendant should have perceived the risk, but did not, is insufficient"). "The known risk of injury must be a strong likelihood, rather than a mere possibility before [the responsible official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted). The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the

24

conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).   Medical negligence does not state a claim under the Eighth Amendment.   *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"). Rather, to prevail on an Eighth Amendment claim in this context, the inmate must show "(1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010).   Officers are entitled to rely on the judgment of medical expert staff.   *See Williams v. Limestone Cty., Ala.*, 198 F. App'x 893, 897 (11th Cir. 2006) ("supervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care"); *see also McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009) ("A prison official may rely on a medical professional's opinion if such reliance is reasonable.");  *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) ("'Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.'") (citation omitted).   Although "there is nothing inherently wrong with 'self-serving testimony,'" *Reid v. Sec'y, Fla. Dep't of Corr.*, 486 F. App'x 848, 852 (11th Cir. 2012), such "statements by a plaintiff do not create a

question of fact in the face of contradictory, contemporaneously created medical records." *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) (citing *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990)); *see also Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (holding court should not have adopted the nonmoving party's version of the facts when it was "so utterly discredited by the record that no reasonable jury could have believed him"; instead it should have relied on the record that included a videotape that "blatantly contradicted" the nonmoving party's version of the facts).

### 1. Overcrowding

Holman contends that prison officials were deliberately indifferent to his safety due to overcrowding.  These conclusory allegations of unconstitutional conditions, without more and whether viewed alone or in the aggregate, are not "sufficiently serious" enough to implicate the Constitution. Holman had not shown that the named correctional defendants knew of an obvious risk of serious harm to him as a result of overcrowding and disregarded that risk, *Farmer*, 511 U.S. at 837, or that the named correctional defendants' actions resulted in the denial of the minimal civilized measure of life's necessities, *Rhodes*, 452 U.S. at 347.

### 2. Defendants Jones, McKinney, Lambert, Laseter, and Mims

On this record, there is nothing to suggest that any defendant knew of or was deliberately indifferent to a substantial risk of harm to Holman on February 21, 2012.  As previously explained, Warden Jones was not personally involved in any of the events, and he cannot be held liable simply because of his supervisory position.

McKinney ordered Holman's placement in segregation, and Holman's assignment to a top bunk was in keeping with his prior assignment to a top bunk. Prisoners are required to keep on their person a copy of their bottom bunk profiles, thus the onus was on Holman to inform McKinney of the bottom bunk profile and present McKinney with the medical paperwork.  It is undisputed that Holman knew this because he previously requested another copy of his profile after it was taken.  Holman fails to create a genuine issue that he presented McKinney with his bottom bunk profile and thus alerted him to his medical need.  Holman now asserts that he did, but it is undisputed that shortly after the events of February 21, 2012, he admitted to a staff member that he not inform the segregation officer of his bottom bunk profile. Holman's most recent self-serving statements do not create a question of fact in the face of his contradictory contemporaneous mental health records.  *E.g.*, *Whitehead*, 403 F. App'x at 403; *see also Scott*, 550 U.S. at, 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  McKinney states that he would have accommodated Holman if McKinney had known of the bottom bunk profile, as do the other officers, and the record is devoid of any evidence that Holman presented officers with his bottom bunk profile or told them he was susceptible to seizures.  Holman's "mere scintilla" of evidence does not suffice to create a genuine dispute whether he alerted McKinney to his serious medical needs. *Walker*, 911 F.2d at 1577; *see also Matsushita*, 475 U.S. at 587 ("Where the record taken

27

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'").  Holman's susceptibility to seizure was not "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Goebert*, 510 F.3d at 1326 (quotation marks and citation omitted).  Consequently, there is no genuine dispute of fact whether McKinney should have known of Holman's serious medical needs or was deliberately indifferent to them, and he is entitled to judgment as a matter of law.

Holman maintains that he complained of dizziness and a headache to Lambert, that Lambert first said he would get Holman to the infirmary, but when Holman complained again, Lambert told Holman to eat his diabetic snack and that Lambert was not going to call anyone.  Taking Holman's version of the events as true, Lambert's acts are no cause for commendation, but they do not suggest Lambert was deliberately indifferent to the risk that Holman would suffer a seizure and fall off the top bunk.  *See Farmer*, 511 U.S. at 838.  Again, it was up to Holman to present his bottom bunk profile to Lambert, but Holman did not.  Based on this record, it would not have been obvious even to a layperson that Holman needed a bottom bunk.  No reasonable juror could find in Holman's favor on the question whether Lambert was deliberately indifferent to the risk that Holman would suffer a seizure and fall from the top bunk.

Once Holman suffered a seizure and fell from the bunk, Lambert and Laseter took immediate action to get Holman medical treatment.  Laseter admits that inmates helped move Holman, but she states four nurses provided him medical care, and medical records

bear out her statement.   Holman maintains that Laseter released other inmates who provided medical help to him instead of medical professionals, but it is undisputed that Holman was unconscious during the seizure, and he presents no evidence beyond his self-serving statements regarding who rendered him medical aid while he was unconscious. Inmate Smith's affidavit does not indicate inmates rendered medical aid to Holman beyond lifting him onto the gurney, and Holman's conclusory allegations based on his subjective beliefs, "in the absence of supporting evidence," are not enough to create a genuine dispute of material fact. *See Holifield*, 115 F.3d at 1564 n.6.   Based on this record, no reasonable juror could find that Lambert and Laseter were deliberately indifferent to Holman's serious medical needs, consequently, Lambert and Laseter are entitled to judgment as a matter of law on Holman's Eighth Amendment claims.

Mims drove a security vehicle that followed Holman to the hospital on February 21, 2012, and he drove Holman back to Bullock on February 22, 2012.   To the extent Holman asserts that Mims knew about Holman's diabetic condition based on his supervisory role, Holman's claim fails for the same reason it fails against Jones and McKinney. The undisputed evidence is that Holman did not inform the segregation officers of his bottom bunk profile or his potential for a seizure. Moreover Mims is not identified in any of the prison records as being present in Holman's segregation cell. Mims did not see Holman fall from the bunk, and he had no knowledge that Holman fell

or had a seizure.[2] Mims is therefore entitled to judgment as a matter of law on Holman's Eighth Amendment claims.

Based on this summary judgment record, no reasonable juror could find in Holman's favor on his claim that he should not have been given a top bunk on February 21, 2012, or that defendants violated the Eighth Amendment in treating him after he fell.

### 3. Defendants Holcey and Harris

Holman asserts that on February 28 and 29, 2012, he was forced by Holcey and Harris to sleep on a concrete floor for two days after he returned to segregation from the infirmary and was suffering what eventually was diagnosed as ruptured disks in his back. It is undisputed that mattresses are removed only from 7 a.m. to 4 p.m. Monday through Friday, and inmates are free to use their mattresses during the remaining hours. It is also undisputed that on February 28 and 29, 2012, Holman had not yet been diagnosed with ruptured disks, and he did not have permission from medical staff to have a mattress all day. Holman received a medical order to keep a mattress it on March 1, 2012, and he thereafter was allowed to keep his mattress. Holcey and Harris were entitled to rely on the judgment of the medical staff, and here they did. *See Williams*, 198 F. App'x at 897. It would not have been obvious to a layperson that Holman needed a mattress all day, and

---

[2] Inmate Smith swears he overheard Mims talking to Holman when he arrived to segregation at about 6:00 a.m. on February 21, and that Mims was again present to respond to the medical emergency at about 10:30 p.m. on February 21. Doc. No. 47. Even Holman did not allege Mims was involved in his medical treatment after the fall, and the court does not read Holman's complaint to include such a claim.

no reasonable juror could find that Holcey or Harris were deliberately indifferent to his serious medical needs. They are entitled to judgment as a matter of law.

### IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The plaintiff's motion to dismiss defendants Giles, Mason, and Nettles be GRANTED.

2. The remaining defendants' motion for summary judgment be GRANTED.

3. Judgment be GRANTED in favor of the defendants.

4. The medical claims be dismissed without prejudice.

5. The remaining claims be dismissed with prejudice.

6. Costs be taxed against the plaintiff.

It is further

ORDERED that on or before **March 7, 2017,** the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which a party objects. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from

attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc*., 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 21st day of February, 2017.

        /s/Charles S. Coody
        CHARLES S. COODY
        UNITED STATES MAGISTRATE JUDGE